George M. Kraw (California Bar No. 71551)
Michael J. Korda (California Bar No. 88572)
Katherine McDonough (California Bar No. 241426)
Kraw Law Group, APC
605 Ellis Street, Suite 200
Mountain View, California 94043
Telephone: (650) 314-7800
Facsimile: (650) 314-7899
gkraw@kraw.com
mkorda@kraw.com
kmcdonough@kraw.com

Valentina Mindirgasova (California Bar No. 272746)
Kraw Law Group, APC
1017 East Grand Avenue
Escondido, CA 92025
Telephone: (760) 747-1100
vmindirgasova@kraw.com

Attorneys for: Plaintiffs, GCIU-Employer Retirement Fund, and
Board of Trustees of the GCIU-Employer Retirement Fund

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GCIU-EMPLOYER RETIREMENT FUND, <br><br> And, <br><br> BOARD OF TRUSTEES OF THE GCIU-EMPLOYER RETIREMENT FUND, <br><br>         PLAINTIFFS, <br><br> v. <br><br> MNG ENTERPRISES, INC. D/B/A DIGITAL FIRST MEDIA, <br><br>         DEFENDANT. | CASE NO. <br><br> **COMPLAINT TO ENFORCE ARBITRATION AWARD, IN PART, AND TO VACATE OR MODIFY ARBITRATION AWARD IN PART, FOR ERISA WITHDRAWAL LIABILITY** |

COMPLAINT - 1

Plaintiffs, GCIU-Employer Retirement Fund and the Board of Trustees of the GCIU-Employer Retirement Fund (collectively the "Plan") bring this action against Defendant MNG Enterprises, Inc. ("MNG Enterprises") pursuant to the provisions of Title IV of the Employee Retirement Income Securities Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") 29 U.S.C. §1381 et seq.

## JURISDICTION

1.　This Court has jurisdiction over this action pursuant to 29 U.S.C. §§ 1401(b)(2) and 1451(c).

## VENUE

2.　Venue is appropriate in this judicial district pursuant to 29 U.S.C. 1451(d), in that the GCIU-Employer Retirement Fund is administered in Pasadena, California.

## THE PARTIES

3.　Plaintiff GCIU-Employer Retirement Fund is a multiemployer pension plan within the meaning of 29 U.S.C. §§ 1002(37) and 1301(a)(3).

4.　Plaintiff Board of Trustees of the GCIU-Employer Retirement Fund is comprised of the present trustees who are the named fiduciaries of the Fund within the meaning of 29 U.S.C. § 1102(a), and is the plan sponsor of the Plaintiff Fund within the meaning of 29 U.S.C. §§ 1002(16)(B)(iii) and 1301(a)(10).

5.　Defendant, MNG Enterprises, Inc. ("MNG Enterprises") is engaged in the newspaper publishing business.　MNG Enterprises is a Delaware corporation. At all times relevant to this action, MNG Enterprises has been an "employer as the term is defined by section 3(5) of ERISA, 29 U.S.C. § 1002(5), and was engaged in an industry affecting commerce, as defined by section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a).

6.　At all times relevant to the withdrawal liability assessments that are the subject of this action the Media News Group controlled group ("MNG") and

the California Newspaper Partnership controlled group ("CNP") were separate controlled groups as defined by 29 U.S.C. § 1301(b)(1).

7.     During all relevant times, MNG and CNP were signatory to a number of collective bargaining agreements under which they were required to make contributions on behalf of its covered employees to the Plan.

8.     Presently, MNG and CNP are part of a single controlled group: MNG Enterprises, as defined by 29 U.S.C. § 1301(b)(1).

## **THE FACTS**

**The Withdrawal Liability Assessments**

**A. MNG**

9.     MNG's obligation to contribute to the Plaintiff Fund ceased during the 2014 Plan year.

10.     As a result of the cessation of the obligation to contribute, the Plan's actuary was tasked with reviewing MNG's contribution history and assessing MNG with withdrawal liability.

11.     The Plan's actuary determined that MNG also experienced four partial withdrawals from the Plan for each plan year where there was a 70-percent decline in contributions based on a three-year testing period ending with the last day of the relevant plan year and including the two prior plan years. *See* 29 U.S.C. § 1385(a)(1); 29 U.S.C. § 1385(b).

12.     The Plan's actuary, prepared MNG's complete and partial withdrawal liability assessments in accordance with ERISA and the Fund's Withdrawal Liability Procedures.

13.     The Plan assessed MNG with a complete withdrawal during the 2014 Plan year pursuant to 29 U.S.C. § 1383, and four partial withdrawals labelled 2012, 2013, 2014, and 2015 pursuant to 29 U.S.C. § 1385(a)(1).

14. On May 30, 2019, the Plan provided MNG with a Notice of Withdrawal Liability and Demand for Payment ("Notice and Demand"), pursuant to 29 U.S.C. §§ 1382(2) and 1399(b)(1).

15. The Notice and Demand included detailed calculations of how the amounts of the four partial and complete withdrawal liability assessments were calculated by the actuary, and provided MNG with a payment schedule for the five withdrawal liability assessments in accordance with the requirements of 29 U.S.C. § 1399(c).

16. The five withdrawal liability assessments included the contribution history of the Torrance Daily Breeze, as a member of MNG per 29 U.S.C. § 1301(b)(1).

17. On December 15, 2006, Hearst Corporation acquired the Torrance Daily Breeze through a Stock and Asset Purchase Agreement with Copley Press, Inc. ("Copley Stock and Asset Purchase Agreement").

18. The Copley Stock and Asset Purchase Agreement gave Hearst Corporation the right to transfer shares of National Media, Inc. and assumed assets and liabilities to a subsidiary, Hearst Torrance Holdings, LLC, and Hearst Corporation completed this transfer.

19. On the same day, December 15, 2006, Hearst Corporation and MNG entered into a Letter Agreement in which MNG acquired the shares of National Media, Inc. and assumed assets and liabilities when its designee was assigned all rights under the Copley Stock and Asset Purchase Agreement, including the Torrance Daily Breeze.

20. MNG's acquisition of the Torrance Daily Breeze was either a corporate stock transfer covered under 29 U.S.C. § 1398 or an asset sale. The Arbitrator determined that the acquisition of the Torrance Daily Breeze was an asset sale.

21.     MNG inherited the contribution history of the Torrance Daily Breeze and its contribution history was correctly included in the MNG withdrawal liability assessments.

22.     The MNG withdrawal liability assessments were calculated by the Plan's actuary pursuant to 29 U.S.C.§1393 and using the Pension Benefit Guaranty Corporation's published interest rate ("PBGC rate") used to value annuities under a mass withdrawal to calculate the unfunded vested benefits of the Plan for the various years that encompassed each of MNG's five assessments.

23.     The Plan actuary's use of the PBGC rate was reasonable and offered the actuary's best estimate of anticipated experience under the Plan, and he so testified under oath at the arbitration hearing.

**B. CNP**

24.     CNP's obligation to contribute to the Plaintiff Fund ceased during the 2013 Plan year.

25.     As a result of the cessation of the obligation to contribute, the Plan's actuary was tasked with reviewing CNP's contribution history and assessing CNP with withdrawal liability.

26.     The Plan's actuary, prepared CNP's complete withdrawal liability assessment in accordance with ERISA and the Fund's Withdrawal Liability Procedures.

27.     The Plan assessed CNP with a complete withdrawal during the 2013 Plan year pursuant to 29 U.S.C. § 1383.

28.     On May 30, 2019, the Plan provided CNP with a Notice of Withdrawal Liability and Demand for Payment ("Notice and Demand"), pursuant to 29 U.S.C. §§ 1382(2) and 1399(b)(1).

29.     The Notice and Demand included a detailed calculation of how the amounts of the complete withdrawal liability assessment was calculated by the

actuary and provided CNP with a payment schedule for the withdrawal liability assessment in accordance with the requirements of 29 U.S.C. § 1399(c).

30.     CNP's withdrawal liability assessment included the contribution history of the Santa Cruz Sentinel, as a member of CNP per 29 U.S.C. § 1301(b)(1).

31.     CNP acquired the Santa Cruz Sentinel in February, 2007 by acquiring the equity of Community Newspaper Group-California, LLC.

32.     Community Newspaper Group, LLC bought the Santa Cruz Sentinel in an asset sale on October 26, 2006, and also assumed obligations under the collective bargaining agreement in place as of that date between the Santa Cruz Sentinel Publishers Company and the Graphic Communications International Union, Local 4N, which required contributions to the Plaintiff Fund.

33.     The operations of Santa Cruz Sentinel continued uninterrupted from the October 26, 2006 asset sale through February 2007, when CNP acquired the equity of Community Newspaper Group-California LLC, and with it the Santa Cruz Sentinel contribution history.

34.     Since Community Newspaper Group, LLC was a successor to the Santa Cruz Sentinel Inc. under the standard set forth in *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, 891 F.3d 839 (9th Cir. 2018), and CNP acquired its equity, per 29 U.S.C. §1398 CNP inherited the contribution history of the Santa Cruz Sentinel for purposes of withdrawal liability.

35.     As it did with the MNG, the Plan's actuary, used the PBGC rate used to value annuities under a mass withdrawal to calculate the unfunded vested benefits of the Plan to determine CNP's withdrawal liability.

36.     The Plan actuary's use of the PBGC rate was reasonable and offered the actuary's best estimate of anticipated experience under the Plan as he testified under oath.

**The Arbitration Proceedings**

37.     MNG Enterprises submitted its dispute regarding both MNG and CNP's withdrawal liability assessments and the methodologies used to calculate those liabilities to arbitration pursuant to 29 U.S.C §1401(a)(1).

38.     The arbitration proceedings were conducted in accordance with the Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes ("Rules") of the American Arbitration Association ("AAA").

39.     MNG Enterprises challenged the Plan's assessment against MNG for 2014 and 2015 partial withdrawals pursuant to 29 U.S.C. §1385(a)(1), alleging that such partial withdrawals could not occur because MNG completely withdrew from the Plan pursuant to 29 U.S.C. §1383 in February 2014 (hereinafter referred to as "Issue No. 1").

40.     MNG Enterprises challenged the Plan's assessments against MNG based on the Plan's inclusion of the contribution history for the Torrance Daily Breeze, alleging that such inclusion was improper (hereinafter referred to as "Issue No. 2").

41.     MNG Enterprises challenged the Plan's assessments against CNP based on the Plan's inclusion of the contribution history for the Santa Cruz Sentinel, alleging that such inclusion was improper (hereinafter referred to as "Issue No. 3").

42.     MNG Enterprises challenged the interest rate utilized in both the MNG and CNP assessments by the Plan's actuary to calculating the Plan's unfunded vested liabilities for withdrawal liability assessment purposes (hereinafter referred to as "Issue No. 4").

43.     The Plan disagreed with MNG's Enterprises challenges as set forth in Paragraphs 39-42.

44.     Issues Nos. 1-4 were arbitrated during a virtual hearing before AAA Arbitrator Bruce Meyerson on October 22, 2020.

45.     The Arbitrator issued a draft award on December 14, 2020, and both parties to the arbitration submitted their comments to the draft award per his request.

**The Issuance of the Final Award**

46.      Arbitrator Meyerson issued his Final Award on January 5, 2021, addressing all issues submitted for arbitration.  A true and correct copy of the Final Award is attached hereto.

47.     On Issue No. 1, the Arbitrator ruled in favor of MNG.

48.     On Issue No. 2, the Arbitrator ruled in favor of the Plan

49.     On Issue No. 3, the Arbitrator ruled in favor of the Plan.

50.     On Issue No. 4, the Arbitrator ruled in favor of MNG.

51.     The MPPAA provides that "[u]pon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award." 29 U.S.C. 1401(b)(2).

52.     This complaint is timely pursuant to 29 U.S.C. 1401(b)(2) as it was commenced upon completion of the arbitration proceedings and within 30 days of the issuance of the award that the Plan hereby petitions this Court to enforce in part and vacate or modify in part.

## PRAYER FOR RELIEF

WHEREFORE, the Plan prays for the following relief and judgment against the Defendant as follows:

(a) The Final Award should be vacated or modified as to the Arbitrator's determination on Issue 1, because the Arbitrator made an error of law by incorrectly holding that ERISA prohibit(s) the assessment of partial withdrawals in the year of a complete withdrawal or subsequently when the

partial decline in contribution base units forming the basis of the partial withdrawal liability occurred before the year of the complete withdrawal. Accordingly, the Plan properly assessed MNG with 2014 and 2015 partial withdrawal liability pursuant to 29 U.S.C. §1385(a)(1);

(b) The Final Award should be affirmed as to the Arbitrator's determination on Issue 2 that the Plan properly included the contribution history of the Torrance Daily Breeze in calculating MNG's withdrawal liability. The Arbitrator correctly applied Ninth Circuit Court's decision in *Heavenly Hanna* and similarly binding successor law decisions, which hold that legal successors in assets sales are responsible for the withdrawal liability of their predecessors;

(c) The Final Award should be affirmed as to the Arbitrator's determination on Issue 3 because the Plan properly included the contribution history of the Santa Cruz Sentinel in calculating CNP's withdrawal liability assessment. The Arbitrator correctly applied 29 U.S.C. § 1398 and the Ninth Circuit Court's decision in *Heavenly Hanna* and similarly binding successor law decisions which together hold that contribution history is attributed for purposes of withdrawal liability in a corporate stock transfer, and that legal successors in assets sales are responsible for the withdrawal liability of their predecessors;

(d) The Final Award should be vacated or modified as to the Arbitrator's determination on Issue 4  because the Arbitrator made an error of law when he failed to uphold the Plan actuary's reasonable interest rate in the absence of any record evidence showing that the actuary's use of the PBGC rate was unreasonable. Specifically, the Arbitrator erred by failing to give proper deference to the Plan Actuary's testimony and report that the interest rate used was reasonable and appropriate and account for possible future

experience because as the actuary testified a settlement-type interest rate was appropriate for a withdrawn employer since the withdrawal amount was fixed and could not be adjusted for future changes in investment markets or industry decline. The Arbitrator erred when he held that the employer met its burden of proof even though it failed to produce any actuarial testimony or other evidence that the Plan's rate was unreasonable;

(e) An award of the Plan's attorneys' fees and costs pursuant to 29 U.S.C. §1451; and

(f) Such other and further relief as the Court finds just and proper.

Dated: January 5, 2021                    KRAW LAW GROUP

                                          By:  /s/ Michael J. Korda
                                          MICHAEL J. KORDA
                                          *Counsel for the Plaintiffs*

# <u>ATTACHMENT</u>
## (Final Award)

## AMERICAN ARBITRATION ASSOCIATION

MNG Enterprises, Inc. d/b/a Digital First Media,

      Claimant,

vs.

GCIU-Employer Retirement Fund,

      Respondent.

No. 01-19-0000-3648

**AWARD**

An arbitration hearing was held in this matter on October 22, 2020. Both parties were represented by counsel. I have considered the argument of counsel, the evidence presented at the hearing, the parties' post-hearing submissions, including the parties' comments on the draft Award, and the entire record in this proceeding.

Three issues are presented in this arbitration:

1.     Whether the GCIU-Employer Retirement Fund (the "Fund)" may include in the withdrawal liability assessment for MNG Enterprises, Inc. ("MNG") assessments for 2014 and 2015 partial withdrawals.

2.     Whether the Fund properly took into account the contribution history of the Torrance Daily Breeze and Santa Cruz Sentinel newspapers in the calculation of MNG's withdrawal liability

3.     Whether the actuarial assumptions used by the Fund's actuary met the requirements of 29 U.S.C. § 1393(a),

### Discussion

### 1. PARTIAL WITHDRAWALS

MNG completely withdrew from the Fund in February 2014. The Fund has assessed MNG $8,650,737 for a 2014 partial withdrawal and $4,229,840 for a 2015

1

1   partial withdrawal.  The parties disagree on whether the assessments for these partial

2   withdrawals may be made despite MNG's complete withdrawal in February 2014.

3         The date of a partial withdrawal is determined on the last day of the plan year

4   for which a plan finds the employer has partially withdrawn; however, there is a

5   three-year testing period that immediately precedes that plan year.  Because the

6   three-year testing period commenced prior to the complete withdrawal from the

7   Fund by MNG, the Fund contends it could properly assess partial withdrawal

8   liability for the 2014 and 2015 partial withdrawals.  Although the calculation of the

9   assessment for a partial withdrawal is certainly a factual assessment, the question of

10   whether a partial liability assessment can be imposed after a complete withdrawal

11   is a purely legal question to which I must "follow applicable law." *See* 29 C.F.R. §

12   4221.5(a)(1).   However, neither party has cited a case or other authority that

13   definitively answers the question.

14         A partial withdrawal occurs when there is a 70% contribution decline for a

15   given plan year.  A 70% contribution decline occurs for a plan year if, during that

16   year  and  the  two  years  immediately  preceding  (the  so-called  "three-

17   year testing period"), the employer's contributions do not exceed 30 percent of its

18   contributions  for  the  high  base  year.   29  U.S.C.  §§  1385(b)(1)(A)  and

19   1385(b)(1)(B)(i). The contribution for the high base year is the average of the two

20   high contribution years within the five plan years immediately preceding the

21   beginning of the three-year testing period.  *Id.* at § 1385(b)(1)(B)(ii). An employer

22   is subject to partial withdrawal liability at the end of the third year of the three-year

23   testing period.  *Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage*

24   *Co.,* 55 F.3d 1318, 1321 (7th Cir. 1995).  Thus, with respect to the 2014 and 2015

25   partial withdrawals, MNG became subject to partial withdrawal liability as of

26

1  December 31, 2014, and December 31, 2015. Because these dates followed MNG's

2  complete withdrawal in February 2014, it contends it should not be subject to

3  assessments for the partial withdrawals. I agree for the following reason.

4      A 70% partial withdrawal is measured on the last day of the plan year for

5  which a pension plan determines whether the employer has partially withdrawn.

6  *Caesars Entm't Corp. v. IUOE Local 68 Pension Fund,* 2018 WL 3000176, at *6

7  (D.N.J. June 15, 2018) December 31, 2014, and December 31, 2015, are the dates

8  for which the 2014 and 2015 partial withdrawals would be determined. Because

9  those dates were after the February 2014 complete withdrawal by MNG, no partial

10  withdrawal liability for the 2014 and 2015 partial withdrawals could be imposed.

11  *See Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage Co.,* 55 F.3d

12  at 1321 n.1 ("Partial withdrawal occurs when a contributing employer has not

13  completely withdrawn from the Fund . . . ."); *see also Gen. Elec. Co. v.*

14  *BoilerMaker-Blacksmith Nat'l Pension Tr.,* 2020 WL 2113209, at *1 (D. Kan. May

15  4, 2020).

16
17  **2. CONTRIBUTION HISTORY OF THE TORRANCE DAILY BREEZE AND SANTA CRUZ SENTINEL**

18      A. Torrance Daily Breeze

19      MNG contends the Fund erred by including the contribution history of the

20  Torrance Daily Breeze (the "Daily Breeze") in the calculation of its withdrawal

21  liability payment. The Daily Breeze last contributed to the Fund in 2005. The

22  following year in December, the Hearst Corporation acquired the assets of the Daily

23  Breeze from Copley Press, Inc. ("Copley") in the Stock and Asset Purchase

24
25
26

1  Agreement (the "Agreement").[1]   Concurrently with that transaction, the assets of
2  the Daily Breeze were transferred to Hearst Torrance Holdings, LLC, an entity
3  owned by MediaNewsGroup, Inc., a part of the MNG Controlled Group.  MNG
4  argues the Daily Breeze's contribution history stayed with Copley because (1)
5  Copley withdrew from the Fund before Hearst acquired the Daily Breeze,[2] and (2)
6  Hearst only acquired the assets of the Daily Breeze.

7       As to MNG's argument it should not assume the contribution history of the
8  Daily Breeze because it only acquired the assets of that paper,  MNG will have
9  successor liability where it is a successor and has notice of any withdrawal liability.
10  *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d
11  839 (9th Cir. 2018).   Contrary to the argument of MNG that a determination of
12  successorship is outside my "jurisdiction,"  in *Sofco Erectors, Inc. v. Trustees of*
13  *Ohio, Operating Engineers Pension Fund*, 2020 WL 2541970, at *10 (May 19,
14  2020),  the court affirmed a determination by the arbitrator that Sofco is "Old
15  Sofco's successor employer with respect to its collective bargaining and employee
16  benefit obligations."  As MNG has offered no evidence the business of the Daily
17  Breeze did not continue after the acquisition by Hearst,[3] it must be assumed from
18  the record MNG is a successor to the Daily Breeze.  As to the second element, the
19  Fund is correct; MNG had notice of the potential withdrawal liability of the Daily
20  Breeze as that is specifically referred to in the Agreement.

21

22

---

23  [1] Although Agreement provides for the sale of the stock of National Media, Inc to Hearst,
    the Agreement provides that as to the Daily Breeze, Hearst acquired the assets of that paper.
24  [2] There is no evidence in the record to support MNG's assertion Copley withdrew from the
    Fund before Hearst acquired the assets of the Daily Breeze.
25  [3] In its closing brief, MNG states the "record is void of any evidence on this issue."  But as
    the burden is on MNG to disprove the Fund's determination, the lack of evidence militates
26  against the position of MNG.

1    Finally, MNG points out the Agreement provided Copley was to retain all
2  liabilities, including withdrawal liability, as it might pertain to the Daily Breeze's
3  participation in the Fund. But the Fund correctly argues it was not a party to that
4  Agreement, and therefore is not bound by its terms, The Fund is correct that "section
5  1392(c) imposes statutory liability for evasion or avoidance 'without regard'" to the
6  terms of the Agreement. *See Operating Eng'rs & Pension Tr. Fund v. W. Power &*
7  *Equip. Corp.,* 2011 WL 2516775, at *4 (N.D. Cal. June 23, 2011).

8    Based on the record, I conclude MNG has successor liability with respect to
9  its acquisition of the assets of the Torrance Daily Breeze.

10    b. <u>Santa Cruz Sentinel</u>

11    In October 2006, Community Newspaper Group, LLC bought the assets of a
12  number of publications, including the Santa Cruz Sentinel (the "Sentinel"). In
13  February 2007 these assets were sold to the California Newspaper Partnership. The
14  parties have stipulated the California Newspaper Partnership is part of the MNG
15  Controlled Group.

16    MNG's argument to exclude the contribution history of the Sentinel from the
17  Fund's calculation of withdrawal liability is that the acquisition of the Sentinel by
18  the California Newspaper Partnership was the result of an asset sale. But, as noted
19  above, where there is continuity of operations between the seller and buyer, there
20  will be successor liability, even in the case of an asset sale. *See New York State*
21  *Teamsters Conference Pension & Ret. Fund v. C&S Wholesale Grocers, Inc.,* 448
22  F. Supp. 3d 188, 193 (N.D.N.Y. 2020). And contrary to the argument of MNG, a
23  determination of successorship is not outside my "jurisdiction." *Sofco Erectors,*
24  *Inc. v. Trustees of Ohio, Operating Engineers Pension Fund,* 2020 WL 2541970, at
25  *10. As MNG has offered no evidence the business of the Sentinel did not continue
26

1    after its sale in 2006, the existence of the asset sale does not preclude the Fund from
2    considering the Sentinel's contribution history in setting withdrawal liability for
3    MNG.

4          And, unlike the situation involving the Daily Breeze, nothing in the record
5    indicates that as part of the acquisition of the Sentinel by the Community Newspaper
6    Group LLC, contribution history and withdrawal liability were not to be transferred.
7    Thus, MNG's claim regarding the Sentinel is denied.

8          **3. ACTUARIAL ASSUMPTIONS**

9          ERISA requires that in calculating an employer's withdrawal liability, a
10   plan's actuary must use "actuarial assumptions and methods, which, in the
11   aggregate, are reasonable (taking into account the experience of the plan and
12   reasonable expectations) and which, in combination, offer the actuary's best
13   estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). The
14   Fund presented the testimony of its actuary, Rex Barker, who explained that as the
15   Fund's actuary, his employer, Milliman, has used the PBGC published rate for
16   similar calculations for over eight years.[4] He testified the actuarial literature states
17   it is reasonable to use the PBGC rate to determine withdrawal liability. Although no
18   witness testified for MNG, it argues the PBGC rate does not take into account the
19   Fund's past experience or reasonable expectations about the future.

20         Mr. Barker testified for the past several years the funding rate he has used
21   was 7%, although that rate is now under review.[5] According to Barker, the funding
22   rate would typically look at the Fund's asset allocation along with capital market

23

24   [4] The PBGC rate is published by the Pension Benefit Guaranty Corporation; it would be
     substantially less than 7%. https://www.pbgc.gov/prac/interest/monthly.
25   [5] In contrast to the 7% rate to which the actuary testified, in the current low interest rate
     environment, the PBGC rate could, in fact, meet the requirements of ERISA. However,
26   that opinion was missing from the actuary's testimony.

6

1   assumptions in order to determine what assets are expected to return over the long

2   term, taking into account the asset classes and variability. On the other hand, Barker

3   explained the PBGC rate is based on a "settlement-type obligation." He stated the

4   PBGC rate does not take into consideration the future experience of the Fund. It is

5   a rate an annuity insurer might use to price the annuity. By using the PBGC rate,

6   instead of the funding rate, the employer's withdrawal liability assessment is

7   greater. Thus, MNG objects to the use by the Fund of the PBGC rate.

8       Withdrawal liability is based on the calculation of a plan's unfunded vested

9   benefits which is the value of vested benefits minus the value of plan assets. Interest

10   rate assumptions are used in making this calculation. Under ERISA, a pension

11   fund's interest rate is presumed reasonable unless the employer shows the actuarial

12   assumptions were, in the aggregate, unreasonable, taking into account the

13   experience of the plan and reasonable expectations. 29 U.S.C. § 1401(a)(3)(B). The

14   Fund points out MNG presented no testimony to show that "Mr. Barker's UVB

15   calculation would not have been acceptable to a reasonable actuary."

16       The Fund is, of course, correct, that the use of an interest rate for funding

17   purposes can be different than the interest rate used for calculating withdrawal

18   liability. And, the Fund is also correct, that it is the burden of the employer to

19   disprove the actuary's methods and assumptions. *Concrete Pipes & Prods. v.*

20   *Constr. Laborers Pension Trust*, 508 U.S. 602 (1993). As explained below, despite

21   the fact MNG presented no actuarial witness of its own, it did meet its burden of

22   proof through the testimony of the Fund's actuary. Nothing about this Award

23   should be interpreted in the future as suggesting in any way an employer is relieved

24   of its burden of disproving the determination of the Fund's actuary. My

25   determination about the actuarial testimony is limited to the specific evidence

26

1    presented in this case.

2         Three cases warrant discussion.   MNG relies on *Sofco Erectors, Inc. v.*

3    *Trustees of the Ohio, Operating Engineers, Pension Fund.*  In that case, the funding

4    rate used by the Pension Fund's actuary was 7.25%.  However, for withdrawal

5    liability, the actuary used the Segal Blend, a blend of the PBGC interest rate and

6    long-term interest rates.  The arbitrator applied the Segal Blend, but the district court

7    reversed.  The court stated that although the Segal Blend has been upheld by courts

8    for many years, it ruled, nevertheless, an actuary must faithfully follow ERISA.

9    Accordingly, the court directed the Pension Fund to "recalculate [the employer's]

10   withdrawal liability based on the 7.25% interest rate  the Fund uses for determining

11   the Plan's funding levels." 2020 WL 2541970 at *10.

12        In *New York Times Co. v. Newspaper & Mail Deliverers'-Publishers'*

13   *Pension Fund*, 303 F. Supp.3d 236 (S.D.N.Y. 2018), the Pension Fund used the

14   Segal Blend—6.5% interest rate—in calculating withdrawal liability.  In contrast,

15   the funding rate testified to by the Pension Fund's actuary was 7.5%.  The arbitrator

16   found the use of the Segal Blend was reasonable.  The district court reversed the

17   arbitrator's decision concluding the arbitrator it did not follow the mandate of

18   ERISA that the determination of withdrawal liability must take into account the

19   experience of the plan and reasonable expectations, including experience under the

20   plan.

21        The Fund, on the other hand, relies on *Manhattan Ford Lincoln, Inc. v. UAW*

22   *Local 259 Pension Fund*, 331 F.Supp.3d 365 (D.N.J. 2018).  In that case, the UAW

23   Pension Fund's actuary used the Segal Blend, which was lower than the funding

24   rate of 7.5%. The arbitrator did not take issue with that determination finding it was

25   not necessary for the actuary to use the same assumptions for funding and

26

1    withdrawal liability calculations.  The court held differences between the funding

2    rate and rate for determining unfunded vested benefits "may permissibly justify, a

3    different approach. Whether that disparity is justified in a *particular* case may raise

4    a factual question; for present purposes, however, it is sufficient that the statute does

5    not rule out such a disparity in *all* cases, as a matter of law."  *Id.* at 388. On the

6    record before it, the court held the employer did not overcome the presumption the

7    actuary's best estimate supported the use of the Segal Blend.  The court found the

8    evidence supported the arbitrator's determination.[6]

9         Congress   created   the   statutory   presumption   in   favor   of   withdrawal

10   determinations  because "[a]ctuarial valuations are based upon and reflect the

11   experience of the plan, the professional judgment of the actuary, and the theories

12   and expectations to which the actuary ascribes. *Combs v. Classic Coal Corp.,* 931

13   F.2d 96, 99 (D.C. Cir. 1991).  But  in this case, the Fund's actuary acknowledged

14   he did not, in setting the withdrawal rate, give consideration to the experience of the

15   Fund; thus, his actuarial determination "did not reflect the experience of the" Fund.

16        The Fund's actuary testified for the past eight years Milliman has used the

17   PBGC published interest rate for the purpose of making withdrawal liability

18   calculations  for the Fund. He explained that we "look at UVB as a settlement-type

19   obligation."  The actuary acknowledged the PBGC rate does  not take into account

20

21   [6]The Fund also relies on *UMW 1974 Pension Plan v. Energy W. Mining Co.*, 464 F.Supp.3d

22   104 (D.D.C. 2020).  In that case, the Pension Plan's actuary looked at the market rate for
     annuities to determine the withdrawal liability rate.   The employer's expert testified the

23   actuary's method was not the most appropriate one but was not unreasonable.  For this
     reason, the arbitrator refused to find for the employer.  On judicial review of an arbitral

24   award, ERISA creates a "presumption, rebuttable only by a clear preponderance of the
     evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. §

25   1401(c).  Thus, the court upheld the arbitrator's determination.  Although MNG has not
     presented its own expert, unlike the employer in the *UMW* case, MNG has not conceded

26   Barker's opinion is "not unreasonable."

the future experience of the Fund nor does it take into account expected future returns on assets of the Fund and he acknowledged he did not consider an alternative to the PBGC rate in making his determination.

> Q: When PBGC is setting its PBGC rate does it take into consideration the future experience of the GCIU fund?
>
> A: No.
>
> * * *
>
> Q: In selecting that rate did you take into consideration your expected returns on the plan's assets as currently invested?
>
> A: No. It was similar to our current thought process that it was intended to be a proxy for a settlement-type liability.
>
> * * *
>
> Q: Did you give any consideration in your decision to adopt the PBGC rate to actually using the funding rate?
>
> A: So, no, I didn't give a lot of thought to getting back to an asset class, asset return assumption . . . .

Viewing the entirety of the actuary's testimony, I conclude the actuary's use of the PBGC rate, on this record, did not comply with the requirements of ERISA. Rather than evaluating the use of the funding rate, the actuary testified his employer, Milliman, used the PBGC in part, because that was the way it has been done for roughly the past eight years.[7] Thus, by adopting the PBGC rate, and failing to take into account the experience of the Fund and reasonable expectations about the future, the use of the PBGC rate in this case, was contrary to ERISA.

---

[7] Mr. Barker did testify the use of the PBGC rate is recognized in the actuarial literature, although he did not explain how that translated into satisfying the requirements of ERISA.

**Attorney's Fees and Costs**

Each party shall bear its own attorneys' fees.  I do not find MNG initiated this arbitration in bad faith or that either party engaged in dilatory, harassing, or other improper conduct during the course of the arbitration. 29 C.F.R. § 4221.10. The fees of the American Arbitration Association and the compensation of the Arbitrator shall be allocated as set forth below.

**Conclusion**

Accordingly,

1.      The 2014 and 2015 partial withdrawals are vacated.

2.      The Fund shall refund to MNG Enterprises, Inc. all payments made under the 2014 Partial Withdrawal and 2015 Partial Withdrawal schedule, with the statutorily required interest, or apply such amounts to the MNG Controlled Group's future payments;

3.      The withdrawal liability assessments as to the Torrance Daily Breeze and the Santa Cruz Sentinel are affirmed.

5.      The withdrawal liability assessments must be recalculated by using a withdrawal liability rate of 7%;

6.      The Fund shall refund to MNG Enterprises, Inc.  any overpayments resulting from the recalculation of the assessments due to the use of the foregoing withdrawal liability interest rate;

7.      The administrative fees and expenses of the American Arbitration Association totaling $20,363.83 shall be borne as incurred, and the compensation of the Arbitrator totaling $17,575.00 shall be borne as incurred.

8.      Each party shall bear its own attorneys' fees; and

11

9.    Any claim not expressly granted in this Award is denied.

DATED this 5th day of January, 2021.

Bruce E. Meyerson, Arbitrator